673 So.2d 100 (1996)
Patricia MACK, on behalf of herself and all others similarly situated, Appellant,
v.
BRISTOL-MYERS SQUIBB CO. and Mead Johnson & Co., Appellees.
No. 95-653.
District Court of Appeal of Florida, First District.
May 7, 1996.
*101 DeWitt M. Lovelace, Destin; Michael D. Hausfeld, Daniel A. Small and Lillian S. Hagen of Cohen, Milstein, Hausfeld & Toll, Washington, DC; Samuel D. Heins, Daniel E. Gustafson and Kent M. Williams of Heins Mills & Olson, P.L.C., Minneapolis, MN; Howard J. Sedran and Johnathan Shub of Levin, Fishbein, Sedran & Berman, Philadelphia, PA; Don Barrett, Lexington, MS; Gordon Ball, Knoxville, TN, for Appellant.
Robert A. Butterworth, Attorney General; Patricia A. Conners, Assistant Attorney General; Mark S. Fistos, Assistant Attorney General, Tallahassee, for Amicus Curiae.
Harry R. Detwiler of Alford & Detwiler, Tallahassee; Douglas D. Broadwater and Max R. Shulman of Cravath, Swaine & Moore, New York City; Bill L. Bryant, Jr. and Donna Blanton of Katz, Kutter, Haigler, Alderman, Marks, Bryant & Yon, Tallahassee; Frank Cicero, Jr., J. Andrew Langan and Wendy L. Bloom, Chicago, IL, for Appellees.
VAN NORTWICK, Judge.
Patricia Mack appeals an order dismissing with prejudice her class action suit against appellees, Abbott Laboratories, Inc.,[1] Bristol-Myers Squibb Co., and Mead Johnson & Co., pharmaceutical companies that manufacture and sell infant formula, on the grounds that she, and the others in her class, are indirect purchasers who lack standing to bring a suit under the Florida Deceptive and Unfair Trade Practices Act (the Florida DTPA), Chapter 501, Part II, Florida Statutes (1993). She contends, and we agree, that the circuit court erred in dismissing her claim because standing for the instant action is expressly provided by subsections 501.211(2) and 501.204(1) of the Florida DTPA. Accordingly, we reverse and remand for further proceedings. We also certify to *102 the Florida Supreme Court a question of great public importance.

Factual and Procedural Background
Mack, a resident of Okaloosa County, purchased for her child infant formula manufactured and distributed by one or more of the appellees. In her class action suit, Mack claims that the appellees, by conspiring to cause retail prices of infant formula to be raised, fixed, maintained and stabilized at artificially high and non-competitive levels, have overcharged Florida consumers for infant formula. She filed a two-count action seeking to recover damages under the Florida Antitrust Act, Chapter 542, Florida Statutes (1993), and under the Florida DTPA. Regarding her Florida DTPA claim, Mack alleges that she and the class members acquired infant formula for family and household purposes and are consumers within the meaning of section 501.211, Florida Statutes (1993) and that:
For over twelve years, defendants have engaged in, and have conspired amongst themselves to engage in, unfair methods of competition and unfair acts or practices in violation of section 501.204 of DTPA in the sale and marketing of infant formula to thousands of Florida consumers at excessively high prices.
She claims that, as a result of these acts, she and the other members of the class have suffered damages.
The trial court's order dismissing her complaint with prejudice states, in pertinent part, as follows:
1. Because the Complaint alleges that Plaintiff and the rest of the putative class are indirect purchasers of infant formula, it fails to state a cause of action under the Florida Antitrust Act, Chapter 542, Florida Statutes (1993). The intent of the Florida legislature in enacting the Antitrust Act was that "due consideration and great weight be given to the interpretations of the federal courts relating to comparable federal antitrust statutes." § 542.32, Fla. Stat. (1993)....
The United States Supreme Court has held that indirect purchasers lack standing under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover damages for violations of the federal antitrust laws. Illinois Brick Co. v. Illinois, 431 U.S. 720, 728-729 [97 S.Ct. 2061, 2065-2066, 52 L.Ed.2d 707] (1977); Kansas and Missouri v. Utilicorp United, Inc., 497 U.S. 199 [110 S.Ct. 2807, 111 L.Ed.2d 169] (1990). Consistent with the above stated intent of the Florida legislature, the standing requirements for a private cause of action under the Florida Antitrust Act parallel the standing requirements of Section 4 of the Clayton Act. Accordingly, Florida adheres to the "direct purchaser" rule enunciated in Illinois Brick, and Plaintiff and the putative class lack standing under Chapter 542.
2. The complaint also fails to state a cause of action under the Florida Deceptive and Unfair Trade Practices Act ("DTPA"), Chapter 501, Part II, Florida Statutes (1993). Plaintiff's DTPA claim is based on the same price-fixing conspiracy alleged in her Florida Antitrust Act claim. Since under the Florida Antitrust Act indirect purchasers do not suffer cognizable injury as a result of alleged price-fixing conspiracies, they are barred from asserting claims under the DTPA based upon such conspiracies. The Florida legislature could not have intended that indirect purchasers could seek relief under the DTPA for alleged violations of Chapter 542 when Chapter 542 itself does not allow such relief.
It is not that indirect purchasers can never sue under the DTPA but where a DTPA claim is based on an alleged antitrust violationas it is herethe direct purchaser rule does apply. Other standing rules apply to DTPA claims derived from other statutes. However, those standing rules are not implicated in this case. Only the direct purchaser rule is involved here.
Granting indirect purchasers standing under the DTPA to assert price-fixing claims that they lack standing to assert under the Florida Antitrust Act would create an irreconcilable conflict between the two statutes. Indirect purchasers would be able to avoid the standing requirements of the Antitrust Act simply by relabeling their claims as DTPA claims.

*103 The Florida Supreme Court has declared that "[c]ourts should avoid a construction which places in conflict statu[t]es which cover the same general field"; rather, where two statutes "relat[e] to the same purpose" they should be construed in harmony. City of Boca Raton v. Gidman, 440 So.2d 1277, 1282 (Fla.1983); see also, Scates v. State, 603 So.2d 504, 506 (Fla. 1992) ("In general, statutes relating to the same subject and having the same purpose should be construed consistently"). The Florida Antitrust Act and the DTPA relate to the same purposei.e., they both are meant to protect the marketplace and to proscribe unfair methods of competition. The DTPA should, therefore, be construed harmoniously and consistently with the Florida legislature's clear intent to allow only direct purchasers to sue for alleged price-fixing conspiracies. Any other result would eviscerate the direct purchaser rule of the Florida Antitrust Act.
Accordingly, Plaintiff and the putative class have no standing to sue under the DTPA.[2]
Mack does not challenge the trial court's conclusion that under Illinois Brick Company v. Illinois, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), she and the others in her class, all of whom are indirect purchasers, cannot bring a Florida antitrust claim. However, she does contend that, as consumers, the class members have standing to bring a claim for redress from the complained-of conduct under the plain language of DTPA.
While this case may ultimately involve complex litigation, the issue before us is relatively straightforward. We view our consideration here as essentially determining whether a consumer-purchaser's standing to sue for price-fixing under the Florida DTPA is governed (i) by the language of the Florida DTPA, which expressly authorizes a consumer to bring an action for damages for violation of DTPA, or (ii) by a policy adopted from Illinois Brick that would bar an indirect purchaser from bringing an action under the Florida DTPA based upon a claim which is in substance an antitrust action to encourage efficient private antitrust enforcement by direct purchasers and to avoid conflict between the Florida DTPA and the Florida Antitrust Act. The Illinois Brick policy reasons persuaded the trial court to deny standing to Mack and the class. For the reasons that follow, we believe that the plain language of our consumer protection statute, in which the legislature has expressly permitted a consumer to recover for price-fixing, must control. Therefore, we hold that the instant cause of action under the Florida DTPA is not barred on the grounds that Mack and the class lack standing to sue.

The Florida DTPA
The Florida DTPA expresses a primary policy "[t]o protect the consuming public ... from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce," section 501.202(2), Florida Statutes (1993), and, as a rule of construction, provides that the act "shall be construed liberally to promote [such] policies...." § 501.202, Fla.Stat. (1993).
Under the Florida DTPA a "consumer" is defined to include "an individual," like Mack and her class members. § 501.203(7), Fla. Stat. (1993). A consumer, like Mack, who has suffered a loss as a result of a "violation of this part," may bring an action for damages. § 501.211(2), Fla.Stat. (1993). The Florida DTPA defines "violation of this part" in subsection 501.203(3), as follows:
(3) "Violation of this part" means any violation of this act and may be based upon any of the following:
(a) Any rules promulgated pursuant to the Federal Trade Commission Act, 15 U.S.C. s. 41 et seq. or this act;
(b) The standards of unfairness and deception set forth and interpreted by the Federal Trade Commission or the federal courts;

*104 (c) Any law, statute, rule, regulation or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices. (Emphasis supplied).
Since "violation of this part" means "any violation of this act," and subsection 501.204(1)[3] proscribes unfair methods of competition as illegal, Mack's claim that she and others were damaged by unfair methods of competition engaged in by appellees gives her standing to bring this suit under the plain language of the Florida DTPA. Further, section 501.204(2) provides that in determining what constitutes an "unfair method of competition" under subsection 501.204(1), "due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to s. 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. 45(a)(1)." Section 5(a)(1) of the FTC Act encompasses violations of the antitrust laws. See FTC v. Indiana Federation of Dentists, 476 U.S. 447, 454-55, 106 S.Ct. 2009, 2015-16, 90 L.Ed.2d 445 (1986) (finding that antitrust violations are unfair methods of competition under the FTC Act). Thus, the acts proscribed by subsection 501.204(1) include antitrust violations.
While subparagraphs (a) through (c) of subsection 501.203(3) set forth possible violations which would permit recovery under the Florida DTPA, it is clear that the legislature did not intend this list to be exclusive. See, Department of Legal Affairs v. Father and Son Moving & Storage, 643 So.2d 22 (Fla. 4th DCA 1994), rev. denied, 651 So.2d 1193 (Fla.1995) (an act does not have to be violative of a specific rule or regulation in order to violate the Florida DTPA). But, even if one of these express violations were required to permit recovery, Mack would nevertheless have standing under DTPA because it is well established that collusive price-fixing constitutes a violation of section 5(a)(1) of the Federal Trade Commission Act. See, Federal Trade Com'n v. National Lead Co., 352 U.S. 419, 77 S.Ct. 502, 1 L.Ed.2d 438 (1957); Keasbey & Mattison Co. v. Federal Trade Com'n, 159 F.2d 940 (6th Cir.1947); In the Matter of Binney & Smith, Inc., 96 F.T.C. 625 (1980); accord, In the Matter of Milton Bradley Co., 96 F.T.C. 638 (1980). Thus, Mack's cause of action, which in essence claims that the pharmaceutical companies have engaged in unfair methods of competition by fixing prices at artificially-inflated levels to the detriment of Florida consumers, has stated a violation of the Florida DTPA.
Although the plain language of the Florida DTPA permits Mack, a consumer, to bring this suit for price-fixing, appellees argue that she lacks standing to bring the instant action because Mack, as an indirect purchaser, would lack standing to bring a similar action under the FTC Act. Appellees reason that, because subsection 501.204(2) of the Florida DTPA requires due consideration and great weight should be given to federal precedent relating to claims arising under the FTC Act, Mack's standing to bring an action for unfair methods of competition under the Florida DTPA, and which are derived from antitrust law, are governed by federal antitrust precedent. Thus, according to appellees, the federal standing rules established by Illinois Brick and Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), preclude Florida consumers who are indirect purchasers from having standing to pursue antitrust claims under the Florida DTPA.
We do not construe subsection 501.204(2) as grafting the federal standing rules onto the Florida DTPA. We agree with Mack that subsection 501.204(2) should be interpreted to mean that, in determining whether particular conduct violates the Florida DTPA, a court should consider whether the FTC and federal courts deem such conduct to be an unfair method of competition or an unconscionable, unfair or deceptive act or practice under section 5(a)(1) of the FTC Act. The reference in subsection 501.204(2) to section 5(a)(1) of the FTC Act, 15 U.S.C. § 45(a)(1), the parallel provision in the federal *105 act declaring unfair methods of competition and commerce to be unlawful, makes it evident that subsection (2) of section 501.204 is concerned with unlawful conduct not who may sue. Section 501.211, not section 501.204, controls the individuals who may sue. A fair reading of section 501.211 reveals no intention by the legislature to limit suits for price-fixing to direct purchasers only.
Further, while the trial court's order recites that "other standing rules apply to the Florida DTPA claims derived from other statutes," we have not been directed to, nor have we uncovered, any Florida case importing standing rules from another statute into the Florida DTPA.

The ARC America Limits on Illinois Brick
In Hanover Shoe, a shoe machinery manufacturer was sued by one of its customers, a manufacturer and wholesaler of shoes, for treble damages under section 4 of the Clayton Act, 15 U.S.C. § 15, for an antitrust violation under section 2 of the Sherman Act, 15 U.S.C. § 2. The manufacturer sought to defend by alleging that the wholesaler passed the overcharge along to its customers and had suffered no injury. The Supreme Court rejected this so-called "passing-on" defense, finding that recognition of the passing-on defense in treble-damage actions "would often require additional long and complicated proceedings involving massive evidence and complicated theories," 392 U.S. at 493, 88 S.Ct. at 2231, and would dilute the incentive of direct purchasers to bring treble damages suits. The availability of a passing-on defense, the Court concluded, could potentially shield the wrongdoer from liability to all potential plaintiffs except ultimate consumers who, in many cases, would have only a "tiny stake in a lawsuit and little interest in attempting a class action." Id. at 494, 88 S.Ct. at 2232. This threat to the efficiency of the treble damages remedy, the Court said, counseled against recognition of a broad passing-on defense. Id.
In Illinois Brick, the State of Illinois brought a treble damages action under section 4 of the Clayton Act against Illinois Brick and other concrete block manufacturers for conspiring to fix the prices of concrete blocks contrary to section 1 of the Sherman Act, 15 U.S.C. § 1. Because the state had purchased the brick not directly from Illinois Brick, but from middlemen, the Court ruled that the State of Illinois, as an indirect purchaser, could not use the pass-on theory offensively to recover damages for antitrust violations. 431 U.S. at 735, 97 S.Ct. at 2069. As in Hanover Shoe, in Illinois Brick the court advanced a number of policy reasons for its decision. First, the court explained that restricting Hanover Shoe to the defensive use of the pass-on theory would create an "unwarranted" risk of multiple liability for defendants. 431 U.S. at 730, 97 S.Ct. at 2066-67. Because Hanover Shoe effectively creates a presumption that direct purchasers are entitled to recover from the defendant, if defendants could not use that presumption against indirect purchasers, the Court reasoned that defendants could be subject to overlapping damage claims. Second, the Court concluded that proving damages resulting from the pass-on of overcharges would be virtually impossible. As it had in Hanover Shoe, the court expressed skepticism that "price and output decisions in the real economic world rather than an economist's hypothetical model," id. at 721, 97 S.Ct. at 2063, could be adequately and efficiently reconstructed in the courtroom. In fact, the Court found that the offensive use of the pass-on theory would be even more unwieldy than the defensive use, because overcharges would have to be traced through each level in the distribution chain until the overpriced goods reached the plaintiffs. Id. at 732-33, 97 S.Ct. at 2067-2068. Third, the Court feared that allowing indirect purchasers to sue for damages under section 4 of the Clayton Act would dilute the effectiveness of the treble damages remedy because indirect purchasers would often have only a small stake in the total potential damages and direct purchasers would have less incentive to enforce the antitrust laws if subsequent purchasers would be able to intervene in their suits and claim a portion, if not all, of the alleged overcharge. Id. Finally, the Court also noted a host of procedural problems that would beset the judiciary should the pass-on theory be permitted in any antitrust suit. The Court expressed an unwillingness to *106 transform treble damage actions into "massive multiparty litigations involving many levels of distribution and including large classes of ultimate consumers remote from the defendant." Id. at 740, 97 S.Ct. at 2071-72.
The Hanover Shoe and Illinois Brick bar to the use of the pass-on theory, however, does not preempt state statutes that provide antitrust remedies for indirect purchasers. California v. ARC America Corp., 490 U.S. 93, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989). In ARC America, the states of Alabama, Arizona, California and Minnesota brought class actions in federal court against various cement producers alleging a nationwide conspiracy to fix cement prices, seeking damages both under the federal antitrust laws and under state antitrust laws that allowed indirect purchasers to recover overcharges passed on to them. Both the federal and state claims were settled against several major defendants. In re Cement and Concrete Antitrust Litigation, 437 F.Supp. 750 (Jud.Pan.Mult.Lit.1977). The district court refused to allow payment of the states' indirect purchaser claims out of the settlement funds, however, on the ground that the state indirect purchaser statutes had been preempted by federal law. The states appealed and the Court of Appeals for the Ninth Circuit affirmed. In re Cement and Concrete Antitrust Litigation, 817 F.2d 1435 (9th Cir.1987). The United States Supreme Court reversed, holding that the state indirect purchaser laws were not preempted by federal law, notwithstanding the Illinois Brick rule limiting federal antitrust standing to direct purchasers. As the ARC America Court said:
Neither [Hanover Shoe or Illinois Brick] addressed the pre-emptive force of the federal antitrust laws. Neither case contains any discussion of state law or of the relevant standards for preemption of state law. As we made clear in Illinois Brick, the issue before the court in both that case and in Hanover Shoe was strictly a question of statutory interpretationwhat was the proper construction of § 4 of the Clayton Act. See, e.g., 431 U.S., at 736, 97 S.Ct., at 2069.
It is one thing to consider the congressional policies identified in Illinois Brick and Hanover Shoe in defining what sort of recovery federal antitrust law authorizes; it is something altogether different, and in our view inappropriate, to consider them as defining what federal law allows States to do under their own antitrust law. As construed in Illinois Brick, § 4 of the Clayton Act authorizes only direct purchasers to recover monopoly overcharges under federal law. We construed § 4 as not authorizing indirect purchasers to recover under federal law because that would be contrary to the purposes of Congress. But nothing in Illinois Brick suggests that it would be contrary to congressional purposes for States to allow indirect purchasers to recover under their own antitrust laws.
* * * * * *
When viewed properly, Illinois Brick was a decision construing the federal antitrust law, not a decision defining the interrelationship between the federal and state antitrust laws. The congressional purposes on which Illinois Brick was based provide no support for a finding that state indirect purchaser statutes are pre-empted by federal law.
490 U.S. at 102-03, 105-06, 109 S.Ct. at 1666, 1667.
In concluding that the federal antitrust laws, as interpreted by Illinois Brick, did not preempt state laws allowing antitrust suits by indirect purchasers, the ARC America court determined that the Ninth Circuit had misinterpreted Hanover Shoe and Illinois Brick when the Court of Appeals had ruled that state laws permitting indirect purchaser recoveries were inconsistent with and stood as an obstacle to effectuating the congressional purposes and policies with respect to the enforcement of the antitrust laws identified in those two cases. 490 U.S. at 102-04, 109 S.Ct. at 1666. Said the ARC America court:
The Court of Appeals also erred in concluding that state indirect purchaser statutes interfere with accomplishing the purposes of the federal law that we identified in Illinois Brick. First, the Court of Appeals *107 concluded that state indirect purchaser statutes interfere with the congressional purpose of avoiding unnecessarily complicated proceedings on federal antitrust claims. But these state statutes cannot and do not purport to affect remedies available under federal law.
* * * * * *
Second, the Court of Appeals reasoned that allowing state indirect purchaser claims could reduce the incentives of direct purchasers to bring antitrust actions by reducing their potential recoveries. The presence of indirect purchaser claims would reduce settlement offers to direct purchasers, the Court of Appeals believed, and if the total liability were to exhaust a defendant's assets, the direct purchasers would have to share the defendant's estate in bankruptcy with indirect purchasers. But the Court in Illinois Brick was not concerned with the risk that a plaintiff might not be able to recover its entire damages award or might be offered less to settle ... Illinois Brick was concerned that requiring direct and indirect purchasers to apportion the recovery under a single statute§ 4 of the Clayton Act would result in no one plaintiff having a sufficient incentive to sue under that statute. State indirect purchaser statutes pose no similar risk to the enforcement of the federal law.
* * * * * *
Third, the Court of Appeals concluded that state indirect purchaser claims might subject antitrust defendants to multiple liability, in contravention of the "express federal policy" condemning multiple liability. 817 F.2d at 1446 (citing Illinois Brick; Associated General Contractors of California, Inc. v. [California State Council of] Carpenters, 459 U.S. 519, 544, 103 S.Ct. 897, 911, 74 L.Ed.2d 723 (1983); and Blue Shield of Virginia v. McCready, 457 U.S. 465, 474-475, 102 S.Ct. 2540, 2545-46, 73 L.Ed.2d 149 (1982)). But Illinois Brick, as well as Associated General Contractors and Blue Shield, all were cases construing § 4 of the Clayton Act; in none of those cases did the Court identify a federal policy against States imposing liability in addition to that imposed by federal law. Ordinarily, state causes of action are not preempted solely because they impose liability over and above that authorized by federal law, see Silkwood v. Kerr-McGee Corp., 464 U.S. [238] at 257-258, 104 S.Ct. [615] at 626-27 [78 L.Ed.2d 443 (1984)]; California v. Zook, 336 U.S. 725, 736, 69 S.Ct. 841, 847, 93 L.Ed. 1005 (1949), and no clear purpose of Congress indicates that we should decide otherwise in this case.
490 U.S. at 103-05, 109 S.Ct. at 1666-1667.
As the supreme court recognized in ARC America, permitting an indirect purchaser suit under state law would not undermine federal enforcement of the antitrust laws. After the ARC America decision, then, it is clear that the principles of Illinois Brick and Hanover Shoe apply only to antitrust actions under federal law and do not restrict state remedies for antitrust violations. If Hanover Shoe and Illinois Brick do not preclude a state antitrust remedy for price-fixing, they surely cannot preclude a state deceptive trade practices remedy for price-fixing.
This is not to say that the concerns raised in Hanover Shoe and Illinois Brick the difficulties of tracing overcharges through a distribution chain,[4] the possibility of multiple liability for defendants, and the prospects of inconsistent or duplicate federal and state judgments[5] are not valid policy considerations under state antitrust or deceptive *108 trade practice statutes. ARC America simply declines to impose on each state the federal legislative antitrust policy of deterring violations by simplifying antitrust litigation. States, such as Florida here, are free to adapt a different legislative policy, such as a policy of compensating individual consumers who are injured, even at the expense of permitting more complex litigation. Following ARC America, issues such as whether deterrence, compensation, or efficient judicial administration should be promoted by antitrust laws and whether and to what extent these goals can or should be harmonized[6] are fundamental policy decisions for the legislature of each state. Recognizing that, under ARC America, it is left to the Florida legislature to make the policy decisions concerning whether to authorize damage actions by consumers for antitrust violations under Florida law,[7] we read subsections 501.202(2), 501.211(2) and 501.204(1) of the Florida DTPA as a clear statement of legislative policy to protect consumers through the authorization of such indirect purchaser actions.
We have not overlooked the argument of the pharmaceutical companies that this ruling in effect will create an Illinois Brick repealer to the Florida Antitrust Act, which the Florida Legislature has declined to adopt. However, we disagree that the ruling in the instant case is a repealer in disguise or that it will eviscerate Florida's antitrust law. Florida's antitrust law, permitting treble damage recovery by direct purchasers injured by price-fixing, remains intact and undisturbed by this ruling. More importantly, we are unconvinced that the legislative history of Florida's Antitrust Act is persuasive in defining the legislative intent for the Florida DTPA. We find the legislative intent of the Florida DTPA evident from the plain and unambiguous words of that statute. Kirby *109 Center of Spring Hill v. State, Dept. of Labor and Employment Sec., Div. of Unemployment Compensation, 650 So.2d 1060, 1062 (Fla. 1st DCA 1995).
We are also not unmindful of the recent opinion of the Texas Supreme Court in Abbott Laboratories, Inc. (Ross Laboratories Div.) v. Segura, 907 S.W.2d 503 (Tex.1995), wherein the Texas Supreme Court held that consumers, as indirect purchasers, had no standing to bring an action alleging antitrust violations under the Texas Deceptive Trade Act (the Texas DTPA). Although Segura, as the instant case, involved an action under a state deceptive trade practices act and state antitrust act against infant formula manufacturers, because of material differences in the applicable Florida and Texas statutes, we do not find Segura persuasive. The majority opinion in Segura did not premise its decision on an analysis of the Texas consumer statute. Instead, the Texas court was persuaded that the policy reasons precluding indirect purchaser recovery under the federal antitrust law announced in Hanover Shoe and Illinois Brick Co. applied with equal force to preclude a consumer claim under the Texas DTPA. 907 S.W.2d at 507. The Segura court concluded that to rule otherwise would undermine administration of the Texas Antitrust Act. 907 S.W.2d at 505-06.[8]
It is apparent, however, that the Florida DTPA is distinguishable from the Texas DTPA in many important respects. For example, the cumulative remedy provision of Florida's DTPA, section 501.213, Florida Statutes (1993), as well as the cumulative remedy provision of the Florida Antitrust Act,[9] are very different from the cumulative remedy provisions in the similar Texas statutes.[10] Most importantly, though, there is no real question that the plain language of the Florida DTPA does expressly permit a cause of action by consumers for unfair methods of competition, including price-fixing. On the other hand, as exemplified by the concurring opinions in Segura, 907 S.W.2d at 507-513, the provisions of the Texas DTPA do not so plainly allow a cause of action against these defendants.
Unlike the Texas DTPA, the Florida DTPA clearly expresses the legislative policy to authorize consumers (that is, indirect purchasers) to bring actions under the Florida DTPA for price-fixing conduct. In the face of such a clear expression of state policy in the statute, it is not for a court to deny a statutory right of action based on the court's preference for a conflicting policy. State ex rel. Eichenbaum v. Cochran, 114 So.2d 797, 800 (Fla.1959) ("[W]hen the legislative *110 branch of the government exercises a legislative power in the form of a duly enacted statute ... it is not the function of a court to explore the wisdom or advisability of the enactment in order to bring its enforceability into question.").

The Florida DTPA and Antitrust Act in Harmony
Finally, we will briefly address the conclusion of the trial court that the Florida DTPA and Florida Antitrust Act have the same purpose and must be construed harmoniously to allow only direct purchasers to sue for alleged price-fixing conspiracies.
It has been consistently recognized that the federal consumer and antitrust statutes were enacted to deal with closely related aspects of the same problemthe protection of free and fair competition. U.S. v. American Bldg. Maintenance Industries, 422 U.S. 271, 279, 95 S.Ct. 2150, 2155, 45 L.Ed.2d 177 (1975); FTC v. Raladam Co., 283 U.S. 643, 647-648, 51 S.Ct. 587, 590, 75 L.Ed. 1324 (1931). Since both the Florida DTPA and the Florida Antitrust Act are patterned after their federal counterparts, we may assume that they too, in part, relate to the same purposesthe protection of free, fair and effective competition.[11]
We accept without question the maxim of statutory construction that a law should be construed in harmony with any other statute having the same purpose. Scates v. State, 603 So.2d 504, 506 (Fla.1992); Wakulla County v. Davis, 395 So.2d 540, 542 (Fla.1981); Mann v. Goodyear Tire & Rubber Co., 300 So.2d 666, 668 (Fla.1974). On the other hand, where statutes operate on the same subject without plain inconsistency or repugnancy, if possible courts should construe them so as to preserve the force of both without destroying their evident intent. 542. Importantly, a later enacted statute should not, if possible, be construed as impliedly repealing the earlier enacted statute. Mann, 300 So.2d at 668.
Applying these maxims to this case, we find that there is no plain inconsistency or repugnancy between the Florida DTPA and Antitrust Act which must be harmonized. We believe that ARC America establishes that two statutes, both of which prohibit anticompetitive conduct, are not inconsistent merely because one allows indirect purchasers to sue for damages and the other does not. Permitting indirect purchasers to sue under the Florida DTPA effectuates the consumer protection policies of the Florida DTPA, but is not adverse to the purposes of the Antitrust Act. Moreover, to accept the argument of defendants, which would eliminate a remedy provided to an entire class of consumersindirect purchasers who have been damaged by alleged illegal price-fixingwould be wholly contrary to the legislature's intent in enacting the Florida DTPA.
We note that when the Florida DTPA was enacted in 1973 it permitted, as it does today, a consumer to sue a defendant for engaging in unfair methods of competition.[12] When the Antitrust Act was enacted seven years later in 1980, its cumulative remedy provision, quoted supra in footnote 9, provided that its remedies were cumulative to existing remedies. If the legislature intended the Antitrust Act to take away the right of a consumer to sue for unfair competition under the Florida DTPA where the defendants' conduct also violated the Antitrust Act, the legislature would have expressly said so. Under the circumstances presented here, we will not imply a repeal of a consumer's cause of action expressly established by the legislature in the Florida DTPA.
Because of the statewide significance of this litigation and the issues presented here under the Florida DTPA, pursuant to Article *111 V, section 3(b)(4) of the Florida Constitution, we certify to the Florida Supreme Court the following question of great public importance:
DOES A CONSUMER HAVE STANDING TO BRING AN ACTION FOR DAMAGES UNDER THE FLORIDA DECEPTIVE TRADE PRACTICES ACT, CHAPTER 501, FLORIDA STATUTES (1993), FOR ALLEGED PRICE-FIXING?
REVERSED and REMANDED for further proceedings consistent with this opinion, and question certified.
MINER and WOLF, JJ., concur.
NOTES
[1] Mack's claims against Abbott were settled during pendency of this appeal.
[2] Although the trial court's order could be read as an adjudication of whether the complaint stated a cause of action under the Florida DTPA, we were assured by counsel at oral argument that, in fact, the complaint was not tested to determine if it stated a cause of action, but the issue before the trial court was whether plaintiffs had standing to bring a Florida DTPA claim.
[3] Section 501.204(1) provides:

Unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.
[4] Economists continue their substantial debate concerning whether the entire overcharge is passed on to the ultimate consumer or whether some or all of the overcharge is absorbed by the direct purchaser and other intermediate purchasers in the distribution chain. Compare, Harris & Sullivan, Passing-On the Monopoly Overcharge: A Comprehensive Policy Analysis, 128 U.Pa. L.Rev. 269, 276 (1979) ("[I]n a multiple-level chain of distribution, passing-on monopoly overcharges is not the exception; it is the rule") with Landes & Posner, The Economics of Passing-On: A Reply to Harris and Sullivan, 128 U.Pa.L.Rev. 1274 (1980) (complete pass-on should not be assumed, even if supply elasticity is infinite and there is no demand elasticity).
[5] See, Report of the American Bar Association Section of Antitrust Law Task Force to Review the Supreme Court's Decision in California v. ARC America Corp., 59 Antitrust L.J. 273, 278 (1990).
[6] Id. 59 Antitrust L.J. at 284-287.
[7] The ARC America Task Force Report of the American Bar Association, supra, note 5, discusses the different premises underlying the federal and state antitrust enforcement approaches. The report observes that a statute authorizing suits by indirect purchasers:

rests on the premise that federal law does not target its damage awards to the actual victims of anticompetitive conduct. Implicit in the state approach is the view that the treble damages remedy is designed primarily to compensate those actually injured by antitrust violations and that courts can efficiently trace overcharges and recreate pricing decisions.
Adherents of the state view also believe the Supreme Court's concern that indirect purchaser suits dilute the treble damages remedy is exaggerated. Hanover Shoe and Illinois Brick rest on the notion that direct purchasers will sue antitrust violators when given a treble damages remedy unfettered by a pass-on defense. A number of commentators, however, have argued that the Illinois Brick rule creates artificial incentives for direct purchaser suits that do not reflect business reality. They note that direct purchasers are usually middlemen who stand in a customer-supplier relationship with the wrongdoer, a relationship that is often vital to the continued viability of the direct purchaser's business. According to these commentators, few direct purchasers will jeopardize this relationship by filing an antitrust claim against the supplier. State indirect purchaser laws seem to follow this reasoning.
By contrast, the federal enforcement scheme, embodied in Hanover Shoe and Illinois Brick, puts primary emphasis on deterring antitrust violations rather than compensating victims. Implicit in the federal view is that antitrust law cannot provide full compensation for the economic dislocation caused by anticompetitive conduct. Even if the victims are fully reimbursed, the economic inefficiencies wrought by the violations persist. Effective deterrence, however, obviates the need for compensation and, absent some other market failure, avoids economic inefficiencies that can never be fully redressed. Hanover Shoe and Illinois Brick serve the policy of deterrence by insuring recovery and reducing the costs of litigation for direct purchasersthose who are most likely to have information about antitrust violations. Those cases also concentrate potential recovery among a few purchasers rather than dividing it among a vast number of plaintiffs whose individual damages are so small that they destroy any incentive to sue. They remove the need for antitrust plaintiffs to engage in the complex tracing of overcharges to prove liability. Finally, they keep litigation relatively manageable by avoiding multiparty lawsuits with hundreds or perhaps thousands of plaintiffs making different claims against the same defendant for the same wrong.
Id. 59 Antitrust L.J. at 290-291 (footnotes omitted). In addition, some commentators urge that "effective private enforcement" may require that "one or more classes of private litigants be motivated and capable of challenging antitrust violations" depending upon "the type of antitrust violation and the remedy sought." Joseph F. Brodley, Antitrust Standing in Merger Cases: Reconciling Private Incentives and Public Enforcement Goals, 94 Mich.L.Rev. 1, 21, 22 (1995).
[8] The Tennessee Court of Appeal has ruled that indirect purchasers have standing to maintain an action against infant formula manufacturers for alleged price-fixing under the Tennessee Consumer Protection Act, T.C.A. §§ 47-18-101 et seq., a statute similar to the Florida DTPA. Blake v. Abbott Laboratories, Inc., 1996 WL 134947, C.A. No. 03A01-9509-CV-00307 (Tn. App., Mar. 27, 1996).
[9] The Florida DTPA, section 501.213, Fla.Stat. (1993), provides in pertinent part:

(1) The remedies of this pact are in addition to remedies otherwise available for the same conduct under state or local law.
The Antitrust Act, section 542.35, Fla.Stat. (1993) provides:
The remedies provided by this Act are cumulative of each other and of existing powers and remedies inherent in the courts.
[10] The Texas DTPA cumulative remedy provision provides:

The provisions of this subchapter are not exclusive. The remedies provided in this subchapter are in addition to any other procedures or remedies provided for in any other law ... An act or practice that is a violation of law other than this subchapter may be made the basis of an action under this subchapter if the act or practice is proscribed by a provision of this subchapter or is declared by such other law to be actionable under this subchapter.
Tex.Bus. & Com.Code § 17.43 (emphasis added). Justice Gonzales, in his concurring opinion in Segura, states that, in Texas under section 17.43, either the Texas DTPA must expressly make conduct illegal or another statute must, and refer to the Texas DTPA as the source for a cause of action to remedy it. Thus, Justice Gonzales concluded, Texas consumers could not maintain a price-fixing cause of action under the Texas DTPA because the Texas DTPA did not expressly make the alleged conduct unlawful and the Texas Antitrust Act did not expressly declare the conduct that it proscribes was actionable under the Texas DTPA. Segura, 907 S.W.2d at 513 [Gonzales, J., concurring].
The Texas Antitrust Act cumulative remedy provides: "The provisions of this Act are cumulative of each other and of any other provision of law of this state in effect relating to the same subject." Tex.Bus. & Com.Code § 15.02(a).
[11] (5) The purpose of Florida's Antitrust Act is:

to complement the body of federal law prohibiting restraints of trade or commerce in order to foster effective competition.
§ 542.16, Fla.Stat. (1993).
The purpose of DTPA, in part, is:
(2) To protect the consuming public from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce.
§ 501.202(2), Fla.Stat. (1993).
[12] Sections 501.203(5), 501.204(1), and 501.211(2), Fla.Stat. (1973).